Before we proceed with the argument in the case, I would just procedurally like to make sure that we are clear on the procedural posture of the case. Sure. This concerns Proposition 200 in Arizona. As I understand it, there were two major aspects of that proposition, one related to identification at the time of registration and one at the time of voting. Is that correct? That's correct. And the issue that gave rise to the injunction that was vacated by the Supreme Court dealt with the presentation of identification at the time of voting. Is that correct? I really shouldn't be speaking on that. I'm just here discussing the intervention issue. Well, I just — I understand that. I just want — I'm addressing this to everybody. Okay. Then, yes. And the issue that is here before us today, which relates to all of you, is only the — has to do with the identification at the time of registration. Is that correct? All right. Fine. So with that, the intervener may proceed. May it please the Court, my name is Joel Spector. I represent the Defendant Intervenor Appellants in this case, Randall Pullen, and yes, on Proposition 200. The issue here is whether the district court applied the wrong standard in determining that Proposition 200 was adequately represented and therefore had no right to intervene. This Court reviews that decision de novo. We submit that the district court ruling cannot be squared with precedent interpreting Federal Rural Civil Procedure 24, which was amended in 1966 to relax the standards for proving inadequate representation. On the one hand, there's a long line of cases beginning with Turbovich in 1972 and followed for years by the Ninth Circuit in Spellman and Freeman, Sagebrush Rebellion, among others, which hold that applicants for intervention merely have to make a minimal showing that their interests may be inadequately represented. And on the other hand — But let me ask you something first, just a procedural thing. In terms of meeting the four-part test, the court below concluded you met the first three prongs, there was no cross-appeal, as I'm aware of. So is it your position it is only the fourth prong that is before us today? Yes, that's correct. Okay. So on the one side, there's a long line of cases starting with Turbovich that concluded that the applicants for intervention merely have to show that their interests may be inadequately represented and that that's a minimal burden. And on the other side, there's another line of cases starting in 2003 with the Arakaki case, which holds that applicants for intervention must make a compelling showing that representation would be inadequate. And in reaching this conclusion, a Ninth Circuit panel neither overruled nor distinguished the previous line of minimal showing standard cases. And in doing so, they merely cited a treatise for the proposition that there needed to be a compelling showing. Now, logically, the compelling showing standard and the minimal showing standard are completely irreconcilable. It has to be either one or the other. Now, this Ninth Circuit ---- Suppose that it's only a minimal showing. What is ñ why is there any showing here? I think we addressed in the briefs the showing that the appellants have made, particularly in the fact that, yes, on Proposition 200 is a committee that was put together with the purpose of ensuring that Proposition 200 was, in fact, enacted by the voters and to defend the ñ to defend Proposition 200. We discussed ñ Back to the first three points. The question is why, whether under the minimal or the more exacting standard, is the government not sufficient to handle it? I saw in your brief there was some conjecture about what you conceived of as potential lack of enforcement or lack of intense enforcement that might happen. But where is the hard showing that the government is not considering how far this case has gone, the battles that have been fought all the way up, indeed, to the Supreme Court, with the extraordinary situation of the Supreme Court taking steps there? It seems a little bit difficult for me to fathom how you're saying that the government is just going to cave on this and is not going to fully represent the interests of your client. Well, I think in ñ I think the answer to your question is addressed in Sagebrush Rebellion. There this Court said that it's not ñ you don't look at what the ñ you don't look at representation thus far, what they've already done. What you look at is whether or not their representation may be inadequate in the future. Well, but that's a totally ñ that's a case where the plaintiff became the defendant. Right. Now, so what's like ñ what has changed here for the future? Why is it less likely that they're going to defend this proposition than they did already? They haven't tried to change sides, have they? They haven't tried to change sides, right. Just want to make sure, yeah. I think in this case, the defendants are obviously elected officials, and they're responsible to the voters of Arizona. And the public mood in Arizona, as evidenced by this most recent election, has changed. So I don't know that their representation of the issue may be inadequate with regard to Proposition 200. This Attorney General was re-elected. I understand that, but the public sentiment, as evidenced by the last election, with regard to the results of the election, seemed to indicate that public mood regarding Proposition 200 has changed. Wouldn't your request for intervention have more force if ñ I mean, okay, you have an election where you say the sentiment has changed. The Attorney General's re-elected. There seems to be no less diligence by the government in enforcing or seeking to enforce it. If something happened, maybe I would say down the road, and you say, well, look, they've stopped. But at this juncture, we have speculation as to what may or may not be interpreted about the voters of Arizona and whether or not the government is going to proceed. At this point, they've shown all that they're going to proceed. Thus far I agree they have, but I don't think that's the issue. I think it's whether or not their representation may be inadequate in the future. And my clients are particularly concerned that that is ñ that may be a problem. And if it is, couldn't you come back and say we want to intervene? You know, if something happens, something specific that you can point to, we don't have that here. We have your conjecture that maybe they're going to read the ñ you know, do the ñ the winds of change. But there's nothing here that suggests the government is being any less diligent. And if they are, you could always move to intervene at that point and say they've stopped trying to enforce the statute. I'm not sure my clients are comfortable waiting until that point. What I do think is clear, though, is that the issue ñ Well, I don't want to discomfort your clients, obviously. What I think the issue ñ what I think the issue here, though, is that it's less important what they've done in the past and more important what they will be doing ñ what they may be doing in the future. The intent behind ñ What indication is there that that may change other than the fact that there was an election? Well, I know the ñ some of the elected officials, as I stated in my brief, have made ñ have previously made comments in opposition to Proposition 200. And the Attorney General issued a statement that narrowly construed Proposition 200. Is that in this record? Yes. It's in the opening brief. Supplemental. Is it in the supplemental? You have a supplemental excerpt of record? Yes. You have your intervener excerpt of record. Was it ñ those were in there? Yes. It should be in there. Well, I know it should be. Was it? To my knowledge, it is in there. I thought it was. But doesn't that result in any time someone in a case being prosecuted by the government decides, well, it seems like the winds have changed, the public opinion has changed. We'll take some polls and we'll come in with the polls and the polls show that people have changed. Now we have concerns whether they'll enforce it later. I mean, doesn't that sort of drive a truck right through the intervention restrictions? Well, I think the intent behind the amendment to Federal Rule of Civil Procedure 24 was to increase the number of people that ultimately are allowed to participate in trials and hearings. And if that ñ I think the point then was to err on the side of inclusion rather than exclusion. And the Supreme Court in Turbovich sort of made that point that all you have to prove is that representation may be inadequate, not that it is or it likely would be. Well, okay, but on the basis of this record, there's no indication that they may be. I think in our ñ Nothing that they have done. Less ñ it's less what they've done. It's more that what they may be doing. Okay. If the Court has no further questions. Good to be in. Thank you. Thank you. Your Honor, Joseph Parks of General Counsel for ñ If you could approach the microphone. Pardon me, Your Honor. Do you wish to argue now or ñ No. If there's a couple of minutes at the end, Your Honor, I would like to make a couple of points to the Court. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Thomas Hudson on behalf of the ITCA plaintiffs, which includes the Arizona League of Women Voters, the Hopi Tribe, and, of course, the Intertribal Council of Arizona, whose Executive Director, John Lewis, is here with us in the courtroom this morning. I'll be addressing the poll tax and undue burden issues this morning. Counsel for the Gonzales plaintiffs, Nina Perales, will be addressing the NVRA and separate equal protection issue. And, of course, with time remaining, Mr. Sparks will address the intervention issue. And we understand that we must keep track of our time and plan to save five minutes for rebuttal if we're able to do so. Turning to the poll tax issue, the key lesson from the Supreme Court cases, Harmon and Harper, is that wealth or paying a fee should have no relationship to voting. As Harper put it, the Constitution bars the payment of any fee as an electoral standard. Can I make a ‑‑ I have a prefatory question, and it's sort of a general question. I'm sorry. Absolutely. And that is, on the overall, our standard here, the Supreme Court seems to have suggested and certainly the district court seems to have suggested that what we need here, I've seen in reading this all kinds of statistics as to how this tax is going to impact people. It has. It hasn't. Voter rolls have gone up. They've come down. The number of people voting in 2000 was less or more than 2006. Why doesn't it make sense to simply send the ‑‑ let the district court have all of the hearings it's going to have, get some final definitive factual results, issue an opinion that we can review? Because it seems much of what we're seeing here is speculation as to what's going to happen. Judge Chiavelli, I might agree with you if we were talking about the polling ID issue, but we're here today and we limited our appeal on the preliminary injunction with respect to the registration issue. And this is not a fight about the facts. This is a fight about the legal significance of those undisputed facts. You spend a lot of time in your briefs talking about the facts, talking about what impact this is going to have, talking about disenfranchisement of voters. That's true. Please. And I believe the district court said this entire matter is singularly a question of fact. So why not let that go back in terms to look at registration records, to look at how many people stayed away, did not register or couldn't register. Let the district court make a full finding. Again, you know, the parties may characterize and focus on different facts. But again, Judge Chiavelli, the facts pertinent to this appeal are not in dispute. And let me give you an example. Let's talk about the polling tax. The fact that's undisputed is that it costs voters in Arizona now between $10 and $100 for those who lack the registration background. For the voters. The estimate of the expert testimony, which was uncontradicted, the state provided no other evidence or suggested no other evidence, was between 2 to 3 percent. Now, granted, we can dispute, is it 20,000 voters? Is it 30,000 voters? Is it 50,000 voters? But it's undisputed that tens of thousands of voters now must, in essence, buy a ticket to exercise their right to vote. And that's what Farman and Harper says is unconstitutional. I saw a statistic on the other side that 98 percent of people are not or potential registered voters are not going to be affected. That's the 2 percent. The opposite of 98 percent is 2 percent, and it's tens of thousands of voters. Let me – as I read the record here, we have a showing of four people, affidavits of about four people. Is that correct? I believe there's – Or examples of people who do not have ID, do not have a driver's license, do not have any State-issued ID. They can't get on an airplane. They can't cash a check. They can't drive a car. Now – and they just stay at home. So on the basis of that, we are supposed to say that the district court should preliminarily enjoin the application of this requirement and that we should not wait until we have a full hearing and see whether or not it's really borne out that there are all these people who really will be burdened. Would you explain why we should do that? Yes, Judge Schroeder. You know, it's people like Eva Steele, who is one of the declarants, who moved here from out of State. And this is really by way of illustration. This is a woman who voted her entire life. Can you also slow down a little bit? And I say that because I have the same problems. Declaration of Eva Steele, who moved here from out of State, voted her entire life, and comes to Arizona to learn she can't register to vote. And that's really by way of illustration of the kind of people that are impacted by the registration requirement. It includes the elderly in nursing homes who don't drive and don't have birth certificates and now find themselves disenfranchised. And, of course, in the preliminary injunction context, ultimately the standard is a lesser standard than what will be applied at trial. And the question is, you know, is there or are there serious constitutional questions concerning Proposition 200? And what's the balance of hardships? And what we know, again, are a couple things. One, I think the poll tax issue is clean. It's simple. The Supreme Court says you cannot charge voters a fee to exercise their franchise. That's what it does. And on the undue burden issue, what we know is — Wait, wait, wait, whoa. 98% of people, we will agree, aren't going to be charged. And do you really think people get licenses so that they can vote? If they go get a license, they can drive. That's right. But a lot of people — But it's not a poll tax. It's merely finding an indicia to allow them to register. In other words, when you go to that poll, you don't have to pay any money. Judge Schiavelli, the 24th Amendment prohibits any tax, not just a poll tax. And the lesson, I think the key lesson, particularly from Harper, is that making the payment of a fee an electoral standard, as the registration requirement does, is a constitutional problem. There's, you know, Native Americans who first got the right to vote in Arizona in 1948 who now are disenfranchised by this statute because of the burdens on registration. And, again, looking at the tailoring of the state — Do we have a record of how many Native Americans do not have the requisite — We don't know the — — money to a membership, tribal membership or eligibility for benefits or other — Judge Schroeder, we don't have the precise numbers. But what we do know is that Proposition 200 only allows Native Americans or it provides to Native Americans three forms of ID to use to register. Two of them don't exist. And the third is something that a lot of tribes don't issue. So we know that it's significant numbers that are impacted by Proposition 200. And that's a serious constitutional problem. And then let me just talk briefly about — It's relevant to know how many Native Americans were accustomed to vote. Before Proposition 200 — Before the proposition. Before Proposition 200, Judge Noonan, the registration rate among Native Americans living on reservations was 90 percent. It's something that many Native Americans — How many voted? I don't think that's in the record one way or the other. They're quite well off. But we're here today to talk about the registration requirement. Are there any numbers on how many people who wouldn't have the documentation, the 2 percent or whatever, in the past have voted? You know, you're saying there's a certain group, there's 2 percent or 3 percent, depending on what you're looking at. Right. Your position is those 2 percent would not have any of the documentation to permit them to register. That's correct. Are there any statistics, figures, anything that suggests of that group who have none of these in addition, how many of them have ever voted or registered or sought to register in the past? That's not in the record, and it doesn't matter for two reasons, if I may. One, we're talking about the right to vote, and if it's taken away, it doesn't — I may not ever — I may not today exercise my right to criticize the government, but I have that right, and if it's taken away, it's burdened. Second, again, we're talking about the context of a preliminary injunction. And are you saying that any requirement that makes it difficult for one person to vote is illegal? I'm not suggesting that, Your Honor. But what we have is, again, an impact on tens of thousands of voters. If I could, let me make one point, and then I'll turn over to Ms. Perales. Yes, Your Honor. In terms of what you just said, didn't Justice Stevens, granted it may have been in the other But say the key is the scope of the disenfranchisement that the novel identification requirements will produce and the prevalence and character of the fraudulent practices. And doesn't that go exactly to what I just said, at least the first prong of that? Isn't one of that one of the exact things that in his — It depends on how you measure the scope, Judge Schiavone. What I submit is that you measure the scope by the number of people who are having their impact, having the right impacted. Whether they — whether they choose to vote — I do, Justice. And the final sort of, I think, you know, we can — maybe we can debate, you know, is it 10,000, 20,000? Is it three instances of fraud, ten instances of fraud? This statute is so poorly tailored to achieve its objective. It allows people to register using forms of ID that don't have anything to do with it, don't necessarily prove citizenship. Two of the forms don't exist. It allowed, you know, critical of the prior system, it grandfathered in everybody into that prior system. And so such a poorly — I don't know why — I don't understand that argument, that because it's easier to vote than if they had actually had — and adopted a rigid proof of citizenship requirement, that somehow that makes it invalid. Because it's not — it's over-inclusive and under-inclusive. It's poorly tailored to achieve its objective, and it comes at the expense of disenfranchising tens of thousands of otherwise eligible citizens. Let me ask — let me put this differently. It's now January of 2007. We are a year and a half from the next general election, more than a year and a half away. This — you are arguing this on the basis of a very minimal record that was put together for a preliminary injunction. And we're still here on the same record that went before the panel on a different aspect of this proposition. Why — what is the procedural status of this now? There's no bar to going ahead and having a hearing on a permanent injunction now, is there? No. I'm sure that will occur, but it won't occur before the upcoming local elections in March. And, of course, registration is an ongoing process. Voter drive efforts of the organizational plaintiffs are hampered on a daily basis. Since you've indicated that — you said it's over-inclusive and under-inclusive, out of curiosity, is there any — assuming for a moment that a State has an interest in ensuring that qualified people vote, short — anything other than — obviously, you agree with what the prior status quo was, and that is that people simply sign the penalty saying, yeah, I'm really a citizen, which is, in effect, largely what the National Act — the National Voter Registration Act is. Is there any other method that a State could use to determine and prove or get confirmation of citizenship that you think would be all right? A short — something beyond just signing something that says, yes, I'm a citizen. Judge Chiavelli, I think from where we are in this case, we would need to see it. Is it possible? Probably. We'd need to look at it. But here, this is the easy case. But what would the components of that be, in your view? Because I can't think of any other method, and I'm really curious. I can't think of any other method that wouldn't involve some peripheral cost, whether it's going someplace. It costs to register. You've got to go register. Is there any way a State could go beyond just accepting someone's signature that would be acceptable to your clients? Let me put it this way. That case is a future case and may be a harder case. Not this case. But this case is the easy case. And let me — I owe it to my co-counsel, Laura, to address the issues on the NVRA. Thank you. Thank you. Good morning. May it please the Court. I am Nina Perales on behalf of Plaintiff Appellants Maria Gonzalez, other individual voters and applicants, and nonprofit organizations. In the National Voter Registration Act, Congress requires States to register voters for Federal elections when those individuals submit properly completed Federal forms. Arizona has violated the NVRA. Well, because you have to accept those forms. I understand that. But is it clear that it says you can't do anything to establish eligibility, that you are indeed a citizen? I mean, it says, yeah, you've got to accept the form. They can't — if the State comes up with a form, it still has to accept the national form. No question. Yes, Your Honor. The statute is quite clear. Beyond mandating that States accept and use the form, Congress also sets out what should be on the form and directs the Federal agency, which is authorized to create the form, and only the Federal agency may create the form, to put these things on the form to establish eligibility. And the form itself, Congress has decided, the things that you do on the form by swearing to the eligibility requirements, including age and address and citizenship, plus checking the box on age and citizenship, are complete to establish your eligibility. And you see in the statute a combination of reading subsection 4 and subsection 7, that Congress made the decision that the form itself establishes eligibility. But it isn't the idea of the — yeah, here's a form that's relatively easy to use. And it would be easy for a State, if it wanted to — if it — let's say it really wanted to discriminate against the — against certain socioeconomic groups or racial groups or whatever and made it — put it in very difficult language, et cetera, that could have that effect. So Congress, no, we don't want you doing that. So as long as your registers — registrants use this form, that's okay. But I'm not sure, and especially in conjunction with the Help America Vote Act, that what Congress is saying, but you can't do anything else to confirm citizenship. I don't see the Act as preempting that extensively. That's the problem I'm having with that. I understand what you're saying. Well, if the Court understands — we think the Act is unambiguous when you read subsection 4 and 7 together. But looking at the congressional record, looking at what was done in HAVA, in fact, if you look at both NVRA and HAVA, twice Congress takes up the question of whether or not to have States additionally verify citizenship by either requiring documents or not. In NVRA in 1993, the conference committee takes out the authorization in the statute to add documentation of citizenship. And this is well explained in the amicus brief of the League of Women Voters. Right. But does it — but is it clear that it takes away — it takes away a Federal requirement, but is it clear that it takes away any State requirement? Yes, Your Honor. If you put the two together? Yes, Your Honor. Yeah, of course you're going to say yeah, right. Well, yes, Your Honor. It would have been interesting if you said no. Not today, Your Honor. Okay. We find that when you read the statute together, that that's exactly what it does. It binds the States to a uniform and national procedure to register voters, to surmount whatever obstacles have been created by States. Congress says you will use this form, and this form will have on it what is needed to establish eligibility. And people will swear to their citizenship, you know, pushing aside requests to have additional proof of citizenship explicitly in the conference committee. And then in HAVA, okay, we've taken up the issue again. We've decided people will check a box to confirm their citizenship. But the statute does not allow States to add upon the requirements of the form. It binds them to a national process. But the intercepts shall be construed to prevent a State from establishing election technology. Administrative requirements are more strict. Now, I understand the argument that that goes to more logistics than eligibility. I understand that argument, but I'm not sure it's as clear as you're saying. Well, Your Honor, that's in Section 304. And the portion of HAVA that talks about the Federal form is in Section 303, where it makes one very specific change to the Federal form, adding the box. After another sparkly debate about proving citizenship and whether one should have to prove it further. So from our perspective, the legislative history tells us Congress took up the question twice. They addressed it quite directly. They made a decision not to have voters have to bring additional information to the form and then to bind the States to that process. When the pre-confirmation came, the Attorney General just didn't know anything about it. I'm sorry, Your Honor? When the pre-confirmation came, they didn't know about the statute. When the pre-confirmation? It wasn't required to be pre-confirmed before. Oh, in the preclearance under Section 5. Yes. That was a little bit of a different process involving a retrogression standard under Section 5. It really didn't take up the question whether it was discriminatory under Section 2 or any other way. If I may re- Could you help me? Are there decisions of other circuits that are relevant? Not on this question, Your Honor. There has been a very well-established law that the National Voter Registration Act is within the power of Congress to enact that Congress may bind the States to this national procedure. But only Bustani v. Blackwell out of Ohio, which talks about a different kind of discrimination with respect to proving citizenship, really speaks to this point. I think it was your point or one of the amici that indicated that, was it, 48 States do not require this kind of proof, right? Yes, that's correct, Your Honor. That would be the Brennan Center. And we also recommend the League of Women Voters amicus brief. If I may reserve the balance of my time. Thank you. Good morning, and may it please the Court. My name is Mary O'Grady. I'm from the Arizona Attorney General's Office, and I'm here today representing the You better do it diligently or we may grant intervention. Yes, Your Honor. We do ask the Court to affirm the trial court decision denying the preliminary injunction in this case that permitted Arizona to continue requiring evidence of citizenship from people registering to vote and also proof of identification at the polls, which is obviously not part of this appeal. Again, the context for the trial court's decision is important in terms of this court's  review. It was at the preliminary injunction phase. We haven't yet had the full trial on the merits, and it was at the preliminary injunction in the midst of the election cycle. In terms of the undue burden here, and I think there's been a lot of discussion on that, but certainly the record here, we do have affidavits from three or four people, no plaintiffs. None of the plaintiffs in this case say they don't have the information necessary to establish citizenship as required by the Act. There are some affidavits from a handful of people who say it would be a burden, but it's not clear that they've tried to register to vote, that their applications have been rejected, and just what the nature of that burden is. The testimony below suggests that for most this is no burden at all. About 98 percent of Arizonans already have this information. Most Arizonans just put their driver's license number on their form and they're done. Let's assume hypothetically that at the end of the day it is shown that 2 percent can't qualify, would otherwise be eligible under the old system. Would you say that would be enough? And let's assume, hypothetically after full evidence, et cetera, would that be sufficient to invalidate the statute? Because counsel made a point when I discussed whether they could or did vote, and that's not the question. Of course, the question is can they try to vote? Have they been disenfranchised? So if it is concluded 2 percent have been in effect disenfranchised because for whatever reason they can't meet those requirements, is that sufficient to invalidate the statute? Your Honor, I don't think so. Again, the Burdick test suggests you have a balancing test. So severe versus non-severe, et cetera, but yeah. Yes, Your Honor. I think you have to go back to the Burdick balancing test, where they're going to look at the severity of the burden and the State's interest involved, and generally if you have reasonable nondiscriminatory restrictions such as this, those laws are going to be okay. And even within that 2 percent, the numbers suggest that was their effort to quantify how many don't have this information readily available to them.  Yes, Your Honor. But certainly you say nondiscriminatory, but the allegation at least is that the Navajos would be disproportionately disadvantaged because of the way they live on the reservation and don't drive and so forth. What do you say to that? Your Honor, a couple of things. First, interestingly, although the Navajo are part of the trial court action, they haven't challenged the evidence of citizenship requirement. They've challenged identification at the polls, but they haven't challenged this requirement at all. And secondly, we don't have any affidavits from any Native American voters who suggested they've been unable to vote because of this evidence of citizenship requirement. We have concerns expressed by counsel, but we don't have that voter before the court. And the same is true with the elderly and nursing homes. We don't have that record that's been developed in the court. So I think the trial court made the right call when she said based on this record, there isn't evidence of a severe burden. And looking at the recent Seventh Circuit decision and also the Supreme Court's comments in Purcell v. Gonzalez, when you're dealing with these kinds of laws, the right to vote is really on both sides of the equation. You have maybe those who may need to take some steps to get the information necessary to comply with the state law, but you also have on the other side legitimate voters whose right to vote may be diluted if there are ineligible people actually voting. And you also have sort of the system concern, which comes through in the Supreme Court's decisions in Burdick, that there is a concern for the integrity of the system. And that's really what the courts are balancing when they deal with these types of laws. So on the whole, the court looked at the evidence, found there wasn't the evidence of an undue burden on the right to vote, wasn't evidence of a severe burden, and properly denied the preliminary injunction. Kennedy. Can we come to the NVRA for a moment? And my recollection is in the NVRA, it is rather comprehensive, does require that it be accepted by the states, even has provisions that you can't require any notary or attestation, which seems like an effort to streamline and make very easy the election and registration process. Are you saying that, for example, a state, if they wanted to, could require, well, you can use that form, you don't have to have it attested to, but we're going to have to get something else attested to, because almost all of the forms that we're talking about have some attestation by some government official, whether it's a notary or non-notary or whatever, whether it's the government over which you have no control in the naturalization or the license or whatever. But with that kind of breadth and with that kind of specificity, doesn't that perhaps suggest a desire to, at least with respect to registration, preempt the field? Your Honor, I think it's true that they were trying to facilitate registration in a number of ways, but I don't think they intended, or I don't think they did, take away the ability of states to verify that people are eligible to vote. And there's language throughout the statute that this is about eligible citizens registering to vote, so we can verify any information on the form, including citizenship. We can't require notarization of the form itself. And I thought the district court did a nice job of explaining this really isn't they told, Congress was specific when they told states you can't do this, but here's what you need to do. You need to make the forms available at the mode of registration. You need to have mail-in processes. You need to use and accept the Federal form. And we do that. We just also make sure up front now that people are citizens when they register to vote, and nothing in the language. But the argument is you haven't done that, because you don't have to be a citizen to get a driver's license. Your Honor, to that extent, it's not a perfect fit acknowledged that we have taken steps to eliminate noncitizens with the driver's license issue. They only accepted licenses issued after October 96. Since that date, Arizona has required evidence of lawful presence to get a driver's license. And since 2000, we can do a check online to make sure that those with licenses who aren't citizens aren't using their license to register to vote. So it's not 100 percent, and the law says many places we can go incrementally, and I think it goes back to that balancing act that policymakers have to engage in when they're doing this kind of legislation. Where you're concerned about preventing fraud, but you're also concerned about making sure the system works efficiently. And here they made the call that this is we're going to screen out all the undocumented from registering for 2000. We'll catch all the noncitizens. And this, but we also will make this available so we can keep the registration working. Do you think you have to establish a compelling interest in preventing fraud in the registration process in order to prevail here? No, Your Honor. I don't think we do, because I don't think we're in strict scrutiny because they haven't shown a severe burden. But I also think they haven't shown a severe burden on the right to vote, which doesn't so we're not in strict scrutiny under the verdict test. But I think there's also case law. We certainly do have a compelling interest in protecting the integrity of our system and preventing fraud. Well, let me come to that in the context of the NBRA. And then that is this. If we agree that the purpose there, certainly as plaintiffs and amici would argue, was to facilitate registration, to make it easy, no requirement of attestation or notarization, isn't what you're saying, yes, it was designed to make it all easy. It doesn't stop the state from trying to confirm eligibility. But we're going to put the burden on the registrant to prove that. Why wouldn't it be consistent with the NBRA if the state has some question about someone, they do their own investigation, but what you're doing is putting the burden, and is that consistent with the goals of the NBRA in terms of facilitating registration, to say, well, we're not going to do a check, but we're going to add all these other things that are going to make the registration more difficult, potentially more difficult. I think nothing in the NBRA takes away the state's ability to figure out what's the best way to accomplish our goal, what's the best way to verify eligibility. Where is the burden on that lie in light of if you say the NBRA was designed to put a minimal burden on the registrant, where should the burden be in terms of that verification? Should it be on the state to do whatever it needs to do if it has a question about any registrations, or should it be on the registrant, and would that be the goals of the NBRA? I think I know what your answer is going to be. I think the state can design the system under the NBRA however it deems most appropriate without running afoul, as long as we're verifying that they are eligible to vote, which is what we're doing here. And nothing in the statutory language prohibits states from imposing this requirement. Well, are you asking us to decide that as a question of law? Because I didn't, I'm not prepared to do that. Your Honor, I don't think you need to at this point. Again, we're under a preliminary injunction standard. The court will see this case again most likely when we're done litigating the case on the merits. And again, this decision, as were all the other decisions, were made in the context of a preliminary injunction proceeding in the midst of an election cycle. And so the court did the right thing in saying, no, we're not going to change the rules while this lawsuit is pending. They maybe have to change them back once, you know, the case is done. We're going to stay the course, develop the record, and permit the state to continue implementing this law. I ask you this. The urgency of this is the plaintiffs alluded to, they said, was because there's an election coming up in March. What election is that? Your Honor, under Arizona law, we have certain sort of consolidated election dates, and in March, if there may be, and I don't know specifically what, if any, are scheduled, but there could be city council elections, there might be school board elections, and every year there may be those elections in March and in May. If there are March elections, when would the registration requirement expire? Or when would you have to be registered? Wouldn't that be pretty close? Typically, you need to complete the registration within 29 days. That's when registration closes for an election. But, again, we don't have, this is an ongoing process. We don't have any evidence that anyone, based on those March elections, to the extent there are some scheduled, which I don't know that. No, there's nothing in this record that indicates that there are people who would vote in March who aren't able to register because they don't have ID? We don't have anything other than the generic sort of I don't have the ID, and so I don't have the registration. So, again, it's a burden for me to register. Is there, from your standpoint, any reason why this can't go forward with a more complete, so that plaintiffs can put on a more complete record, if they so wish, in an effort to obtain a permanent injunction? No, Your Honor. I really think that's the appropriate course to affirm the trial court's decision. We'll go back on the merits and finish up the case, and then move forward with whatever appellate proceedings follow from that. In your view, discovery, is there a trial date or is there an estimate on how long this is going to take before it gets to the district court for final disposition? We don't have a scheduling order set. We have some other proceedings that will be going on in February in terms of ID at the polls in the Navajo. Another point in terms of these local elections, the way our voter registration system works, we, if you register to vote, you're registered to vote in State and Federal elections. But if there's a preemption issue, that only goes to registering for the Federal elections. That's all NVRA applies to. So, and those elections don't happen for another two years. Thank you, Your Honor. We ask the Court to affirm the trial court judgment. Thank you. Thank you, Your Honors. I'll try to be brief, but a few points that I believe are worth emphasizing. Arizona is the only State in the country that requires every citizen wishing to register to vote to come up with these documents. The NVRA is a purely legal issue. It's purely an issue of statutory interpretation. Exhibit 217 in the record includes declarations from individuals who tried to register using the Federal form and couldn't. They want to vote. The footnote 49 in our reply brief includes links to some of the upcoming local elections in March. The Court can take judicial notice of those. And under Burdick, the question is, you know, whether the extent of the interests make it necessary to so burden the right. It's undisputed that there's only been four cases of people allegedly voting in elections that are noncitizens. It's undisputed that the counties rejected over 20,000 registration applications. That imposes an undue burden on the right. And it's certainly, given the way this statute is tailored, it certainly wasn't necessary to so burden the rights. Judge Noonan. Thank you. You made an interesting point on that. I've forgotten which one it was. I apologize. It actually argued that the preliminary showing of actual improper voting is not a prerequisite to this, to a statute such as this where the State says, no, okay, maybe we don't know how many did or didn't. We can't figure it out. But we're going to make sure they don't. But why is it absolutely necessary to show that I don't know how many you want. You said I think there were 234 reported cases of which 10 were prosecuted or something happened and none of them. But then they decided to, I guess, some city council person. But my question is, is that necessarily a predicate? Perhaps not. But it certainly, if that's the argument, that goes in the balance under verdict. And that's a pretty weak interest, particularly on this record. Granted, we're preliminary injunction. But when there's no evidence of even sort of this concern of fraud that we've been hearing about. So I think perhaps it can be considered. No evidence of concern. The State has a concern. The voters show the concern. It's a pretty weak interest if that's why we're disenfranchising tens of thousands of voters. Your time has expired. Thank you. Thank you. Thank you, Your Honors. Mr. Sparks, did you want to say anything? May it please the Court. I'm Joe Sparks, Attorney for General Counsel for Intertribal Council of Arizona. We've served pro bono since the beginning of that organization in the 60s. It consists of 21 tribes. In response to the plaintiff and intervention, there's several things that I would like to point out. One, and Judge Schroeder mentioned that, is in the Sagebridge case, Secretary Watt previously was the attorney on the other side. If it's already been mentioned, why do we need to point it out? I'm sorry? I said if it was already mentioned, why do we need to point it out again? Is there anything that hasn't been mentioned that you want to point out? Yes, Your Honor, and that is that this Court has an uninterrupted line of cases beginning in 1995 with the Forest Conservation Council, the Arakata, Carpintero, and Pratt v. Bradbury case of showing that where the government is adequately representing the interest of an intervener. Qualification number four has not been met. Here, I'm so old that the rule used to be an abundance of zeal, but now it is diligent representation. And Mr. That standard has been met. And that standard has been met. One other point, and that is Attorney General Goddard, notwithstanding his whatever he may have said publicly before Prop 200, did in fact take this all the way to the Supreme Court while he was standing for election and prevailed there and came back. And therefore, the likelihood that he would somehow change direction or the 16 counties would up and head for the South is quite unlikely. How about if we just take judicial notice of the ferocious defense of the statute by the government? Well, maybe not judicial notice, but at least an abundance of zeal in the old sense and diligence here. Thank you. We understand your position. Thank you. Before ordering the case submitted, we have a couple of pending motions to file amici briefs. We have seen no objection to the filing of those briefs, and so they will be ordered, filed, and an order will be entered to that effect. All right. And having said that, that concludes the court the case just argued is submitted for decision. That concludes the Court's calendar. The Court will adjourn and reconvene for a ceremonial session. I want to simply note that cameras are permitted for the ceremonial session for those of you who are here for that. And so with that, this Court for this session stands adjourned. All rise. This Court for this session stands adjourned. Thank you.
judges: Schroeder, Noonan, Schiavelli